IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ULTRATECH, INC.,

    Plaintiff,

v.

TAMARACK SCIENTIFIC CO.,

    Defendant.

No. C 03-03235 CRB

**MEMORANDUM AND ORDER**

In May 2005, the Court entered judgment in favor of defendant Tamarack Scientific Company ("Tamarack") on the ground that the patent-in-suit, the '813, is invalid. Now pending before the Court is Tamarack's motion for nearly $2 million in attorneys' fees and costs. After carefully considering the arguments and evidence submitted by the parties, and having conducted an evidentiary hearing, the Court DENIES Tamarack's motion.

**PROCEDURAL HISTORY**

Ultratech filed this patent infringement action against Tamarack, a direct competitor, alleging that Tamarack has infringed and is infringing Ultratech's '813 patent. Tamarack answered the complaint and made counterclaims. Ultratech responded by moving to strike Tamarack's "defamation" claim under California's anti-SLAPP statute. The Court denied Ultratech's motion, concluding that Tamarack had not made a defamation claim.

The Court subsequently issued its claim construction order. The order generally

rejected Ultratech's proposed construction and adopted Tamarack's construction. The Court did, however, grant Ultratech's motion to strike those portions of Tamarack's claim construction briefs that speculated as to the reasons Ultratech was taking certain positions. Tamarack subsequently moved to amend its answer to add a claim for inequitable conduct on the ground that it had only recently learned that Ultratech had failed to disclose to the Patent and Trademark Office ("PTO") a disqualifying offer for sale. The Court allowed Tamarack to amend its answer and counterclaim over Ultratech's objection.

Based on the Claim Construction Order, Tamarack moved for summary judgment of its inequitable conduct claim. Ultratech responded by moving for summary judgment of literal infringement and on Tamarack's invalidity defenses, as well as for a preliminary injunction. The Court granted Ultratech's infringement motion in part and denied the motion in part and denied its other motions in all respects. As for Tamarack's motion, the Court concluded that there was a genuine dispute as to whether Ultratech intentionally withheld from the PTO its 1990 offer for sale it made to IBM, and therefore summary judgment of inequitable conduct could not be granted.

Ultratech moved for reconsideration of the Court's order denying its motions for summary judgment. Its motion, in effect, sought reconsideration of the Court's claim construction order, even though the Court's granting of its summary judgment motion of literal infringement was based on the same claim construction of which it was seeking reconsideration. The Court denied the motion for reconsideration without requiring Tamarack to respond.

Ultratech appealed the Court's denial of its preliminary injunction motion and, at the same time, moved for summary judgment of literal infringement with respect to other claims and products. Tamarack did not oppose the summary judgment motion; instead, Tamarack moved for an early bench trial on its inequitable conduct claims. The Court denied Tamarack's motion. The Court also denied Ultratech's attempt to stay this action pending its appeal. (Ultratech dismissed the appeal after this Court entered judgment).

In its Final Infringement Contentions, see Patent Local Rule 3-6, Ultratech withdrew its accusations of infringement against certain Ultratech products. Tamarack subsequently moved for summary judgment of non-infringement by those products. The Court denied the motion as premature; Tamarack was essentially asking the Court to rule in advance on the claim preclusion effect of Ultratech not asserting infringement of those products in this lawsuit. The Court noted that unless and until it permitted Ultratech to amend its Final Infringement contentions to add the withdrawn products to this lawsuit, see Patent Local Rule 3-7, the products are not at issue. Ultratech then filed a motion to amend its Final Infringement Contentions, which the Court denied as untimely.

The parties subsequently cross-moved for summary judgment on Tamarack's invalidity claims and defenses. The Court denied Ultratech's motions and granted Tamarack's motion, concluding that the '813 is invalid as anticipated. Tamarack moved the Court to hold a bench trial on its inequitable conduct claim on the ground that the resolution of such claim would be relevant to Tamarack's request for attorneys' fees and costs. As the Court had already declared the patent invalid with respect to all claims still at issue in this lawsuit, it declined to hold a trial. The Court noted that, if necessary, it would hold an evidentiary hearing on the inequitable conduct claim in connection with the motion for attorneys' fees. It then entered judgment in favor of Tamarack.

During the litigation the parties filed several discovery motions, all of which were heard by Magistrate Judge James Larson. According to the Court's count, Tamarack filed six motions and Ultratech three. Ultratech lost all but one of the motions in most respects. On at least three occasions, Ultratech filed objections to the Magistrate Judge's order; the Court overruled Ultratech's objections each time. The Magistrate Judge, however, never ordered Ultratech to pay monetary sanctions.

## THE PENDING MOTION

Tamarack moves for attorneys' fees and costs on the ground that this is an "exceptional" case. See 35 U.S.C. § 285. Tamarack's primary (but not only) argument is that this is an exceptional case because Ultratech engaged in inequitable conduct before the

PTO. It also argues that Ultratech's litigation conduct, specifically, its discovery conduct and the various, conflicting positions it took in this case, warrant an award of fees and cost. As the issue of whether Ultratech engaged in inequitable conduct turns, at least in part, on Ultratech's intent, the Court held an evidentiary hearing on the intent issue. David Markle, a co-inventor of the '813, testified and was subjected to cross-examination. After the hearing, the Court permitted the parties to file supplemental memoranda.

## DISCUSSION

### A. Legal Standard

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified and otherwise bad faith litigation; a frivolous suit or willful infringement." Phonometrics, Inc. v. Westin Hotel Co., 350 F.3d 1242, 1246 (Fed. Cir. 2003) (internal quotation marks and citation omitted). "When 'the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence.'" Id. (citation omitted).

In addition to awarding fees pursuant to section 285, a court may award fees and costs against an attorney pursuant to 28 U.S.C. section 1927, if the attorney "vexatiously" and "unreasonably" multiplied the proceedings. Id. A court may award section 1927 sanctions against an attorney only if the Court finds that the attorney acted recklessly or in bad faith. See T.W. Electric Services, Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 638 (9th Cir. 1987); see also Phonometrics, 350 F.3d at 1246 (holding that in a patent case an award of sanctions under section 1927 is governed by the law of the regional Circuit).

### B. Inequitable Conduct

Tamarack's primary argument is that Ultratech engaged in inequitable conduct before the PTO by creating the impression that the prior art did not involve the use of a pattern recognition system, such as Cognex, in a semiconductor lithography exposure and alignment

4

system; specifically, it contends that Ultratech was required to disclose its 1990 offer for sale of such a system to IBM.

"Inequitable conduct resides in the failure to disclose material information with an intent to deceive or mislead the PTO." Critikon, Inc. v. Becton Dickinson Vascular Access, 120 F.3d 1253, 1256 (Fed. Cir. 1997). Materiality and intent must be established by clear and convincing evidence. See Bruno Independent Living Inc. v. Acorn Mobility, 394 F.3d 1348, 1351 (Fed. Cir. 2005). "Once thresholds of materiality and intent have been established, the court conducts a balancing test and determines whether the scales tilt to a conclusion of that inequitable conduct occurred." Critikon, Inc., 120 F.3d at 1256. "The more material the omission or the misrepresentation, the lower level of intent required to establish inequitable conduct, and vice versa." Id.; see also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1381 (Fed. Cir. 2001) ("When balanced against high materiality the showing of intent can be proportionately less").

The Court finds that Ultratech's offer for sale was material for the reasons set forth in its Memorandum and Order dated October 12, 2004. The Court has considered all of the evidence and argument submitted by Ultratech since that Order, and nonetheless concludes that Tamarack has shown by clear and convincing evidence that Ultratech's offer for sale should have been disclosed to the PTO. Ultratech's arguments, to a large extent, are premised on its own construction of the claim terms, a construction which this Court has repeatedly rejected as not supported by the language of the claims or the specification.

The next question, then, is whether Tamarack has proven by clear and convincing evidence that Ultratech failed to disclose its offer for sale with an intent to deceive. As a preliminary matter, the Court notes that Ultratech contends that the Court held in its October 12, 2004 Memorandum and Order that "Tamarack had failed to carry its burden in proving an 'intent to deceive' as part of its inequitable conduct defense," Tamarack Opp. Brief at 1, and therefore Tamarack must produce new, additional evidence of intent in order to prevail.

5

Ultratech is wrong. The Court unambiguously denied Tamarack's motion for summary judgment because there was a genuine dispute of fact as to intent. If, as Ultratech contends, the Court had found Tamarack's evidence insufficient, the Court would have granted Ultratech's cross-motion for summary judgment. The Court did not.

To enable the Court to resolve the disputed issue of intent, David Markle, a co-inventor of the '813, testified at an evidentiary hearing. He had also previously submitted several declarations on the intent issue. Mr. Markle's primary explanation for why he did not disclose Ultratech's 1990 offer to IBM is that it simply was not "on his radar" as information that should be disclosed to the PTO. He has offered various explanations for the response being "off his radar." He also testified that even if he had thought of Ultratech's response during the prosecution of the '813, he still would not have disclosed the offer for sale.

For example, he asserted in his July 2004 declaration, and again in his testimony before the Court, that he would not in any event have viewed Ultratech's response as material because the product Ultratech offered for sale in 1990 did not permit the operator to select an arbitrary alignment pattern during operation of the lithography system. This assertion as to Mr. Markle's belief is incredible. The Court, of course, has found that the '813 includes no such limitation. And Mr. Markle himself admitted in his deposition that there is nothing in the language of the claims or in any of his declarations submitted to the PTO that suggests the '813 is limited to exposure and alignment systems in which the operator can select any pattern at the time of operation. Moreover, Ultratech's preliminary infringement contentions, which were reviewed by Mr. Markle, included no such limitation, as is evidenced by their identifying Tamarack devices that do not meet such limitation. Indeed, in all of his declarations and in his live testimony, Mr. Markle has never identified anything in the claims or the specification that support his cramped reading of the patent; instead, the evidence supports a finding that Mr. Markle did not understand that the '813 is *limited to* systems in which the operator selects the pattern at the time of operation until after the

6

commencement of this litigation. Mr. Markle's testimony about the "through-the-lens" distinction is equally unpersuasive.

Mr. Markle's testimony was unconvincing in other respects. For example, he continues to claim that the '813's use of pattern recognition [Cognex] was "not very relevant" to the patent. 8/9/05 Tr. at p. 56. Yet, when Mr. Markle was inquiring as to any potentially disqualifying offers for sale, he characterized his invention as a "pattern recognition alignment system." In addition, in his July 2005 declaration he claimed not to know very much about Cognex and that his co-inventor, Robert Brown, was the person most familiar with the pattern recognition aspects of the invention. It was Mr. Markle, however, who submitted declarations to the PTO regarding the pattern recognition aspects of the invention; indeed, Mr. Markle told the PTO that the invention's "arbitrary, user selectable pattern is clearly novel and non-obvious" over the prior art. If, as Mr. Markle claims, he did not know very much about Cognex (the preferred embodiment of the pattern recognition aspect of the invention), then perhaps he should have disclosed as much to the PTO.

Other facts also support a finding of an intent to deceive. The evidence establishes that shortly before Mr. Markle began preparing the application for the '813, he participated in Ultratech's response to a 1992 IBM Request for Quotation ("RFQ"). The 1992 RFQ was a modification or continuation of the 1990 RFQ: IBM designated the 1990 RFQ "Level A," and the 1992 RFQ as "Level B." Also, Mr. Markle had in his own files a document, prepared by another Ultratech employee, comparing the Level A request with the Level B request. This evidence suggests that Mr. Markle was reminded of Ultratech's 1990 offer for sale shortly before he applied for the '813.

In addition, during this litigation Tamarack specifically requested that Ultratech produce any documents relating to proposals between Ultratech and IBM, or any third party, relating to the use of pattern recognition in a substrate exposure and alignment system. Although Ultratech concedes that the 1990 IBM RFQ and Ultratech's response are

7

responsive to this request, Ultratech did not produce the documents; instead, Ultratech responded that it did not have any such documents. After Tamarack disclosed the documents (after having obtained them through a third-party subpoena), Ultratech produced them. Ultratech's failure to produce these critical documents is consistent with an intent to deceive; that is, to conceal from the PTO and Tamarack the existence of the potentially disqualifying offer for sale. While Ultratech's counsel attests that he was not aware of the documents at the time of Ultratech's original response, and the Court accepts that representation, he also declares that Mr. Markle was the Ultratech official responsible for Ultratech's document production. Mr. Markle has testified that he was aware of Ultratech's response to the 1990 RFQ and he offers no explanation as to why he did not initially produce the responsive documents.

The above evidence supports a finding by a preponderance of the evidence that Ultratech failed to disclose its offer for sale to IBM with an intent to deceive the PTO. The standard here, however, is heavier: clear and convincing. While the issue is close, the Court concludes that Tamarack has not proved by *clear and convincing* evidence that Mr. Markle (and thus Ultratech) intended to deceive the PTO.

First, the record is undisputed that during the application for and prosecution of the '813 Mr. Markle never discussed Ultratech's 1990 offer for sale to IBM with anyone, including his co-inventor Mr. Brown. This silence supports Mr. Markle's assertion that he simply did not think about the offer while applying for the '813.

Second, while the record demonstrates that Mr. Markle was aware of Ultratech's response to IBM's 1990 RFQ and had reviewed it, he was not the primary "author" of Ultratech's response to IBM's RFQ. This fact, too, is consistent with his assertion that it was simply "not on his radar" in connection with his prosecution of the '813.

8

Third, Ultratech's response was just that, a response; Ultratech's proposal was not accepted by IBM and thus Ultratech never built the device it offered for sale. This fact makes it more likely that it would not have been on Mr. Markle's "radar."

Fourth, while preparing to file the application for the '813, Mr. Markle asked the Ultratech business office when Ultratech's pattern recognition alignment system was first offered for sale. There is no evidence in the record that anyone ever suggested to Mr. Markle that Ultratech's unsuccessful response to IBM's 1990 RFQ was such an offer for sale. A November 13, 1992 memorandum from Mr. Markle demonstrates that he had become aware of a 1989 memorandum suggesting that Ultratech had proven the feasability of using pattern recognition for alignment. Mr. Markle wrote:

> I can find no record of a quotation made to a customer for this system but perhaps a quotation was made through your office. If you would be so kind as to let me . . . know the dates of any quotes on pattern recognition alignment made through your office then I will be able to determine if it is possible for us to patent a pattern recognition based prealignment system.

8/9/2005 Hearing Exh. 39. If Mr. Markle were intent on deceiving the PTO one would have expected him to have relied on his initial futile search for a quotation; instead, he took additional steps to determine if there was a quotation "out there" of which he was not aware. Such steps are consistent with his testimony that he did not intentionally withhold disclosure of Ultratech's response to IBM's RFQ.

Finally, and most importantly, the Court observed Mr. Markle on the witness stand and found him credible when explaining that Ultratech's 1990 response never crossed his mind. While, as explained as above, some of Mr. Markle's testimony was not credible, on balance, the Court still believes that Mr. Markle did not intentionally suppress Ultratech's 1990 response for all the reasons stated above. At a minimum, the Court cannot find by clear and convincing evidence that he (and thus Ultratech) *intended* to deceive the PTO.

Paragon Podiatry Laboratory, Inc. v. KLM Labs., Inc., 984 F.2d 1182 (Fed. Cir. 1993) does not require the Court to find otherwise. In that case it was undisputed that the patentee and its attorneys were aware of a prior material commercial offer for sale. The original explanation for the failure to disclose the offer was the attorney's statement that the product offered for sale was not reduced to practice. The attorney, however, never contended that he believed a product had to be reduced to practice for the on sale bar to apply (it does not). Id. at 1193. Thus, that explanation was false. Next, the attorney claimed that he believed the sales were experimental, but he admitted to knowledge of other facts that showed the sales were not experimental; thus, that explanation, too, was false. Id. Here, in contrast, for all the reasons stated above, the Court does not find that Mr. Markle's "off-the-radar" explanation was false. Moreover, Paragon was a summary judgment case; here, the Court had the benefit of observing Mr. Markle's live testimony.

In sum, even assuming that Ultratech's offer for sale to IBM was "highly material" to Ultratech's patent application, the Court does not find that Tamarack has shown by clear and convincing evidence the level of wrongful intent necessary for this Court to find that Ultratech engaged in inequitable conduct.

## C.     Other Exceptional Case Arguments

The Court is not persuaded by Tamarack's other arguments as to why this case warrants an award of attorneys' fees and costs. The Court does not find that Ultratech believed its patent was invalid when it filed this lawsuit. Nor can the Court say that Ultratech's claim construction position is so frivolous as to warrant sanctions; to be candid, this Court is reluctant to hold that any claim construction is frivolous, given the well-known reversal rate in the Federal Circuit. See Harris v. Ericsson, Inc., 417 F.3d 1241, 1266 (Fed. Cir. 2005) (Gajarsa, J., dissenting) (noting that the Federal Circuit has a high reversal rate).

The Court also does not find that Ultratech's litigation conduct makes this an exceptional case. A patent lawsuit with nine discovery motions is not exceptional;

unfortunately, in the Court's limited experience patent lawsuits are more contentious and aggressively litigated than any other area of law. Moreover, as the Court did not hear the discovery motions it is not in a position to evaluate the relative merits of Ultratech's positions; the Court notes, however, that the Magistrate Judge did not order Ultratech to pay any monetary sanctions.

Ultratech's continued pursuit of the "withdrawn models," while violating the intent of the local patent rules, does not make this an exceptional case. This Court and the Magistrate Judge ultimately did not permit Ultratech to pursue products it did not challenge in its Final Infringement Contentions.

In sum, considering the totality of the circumstances, the Court does not find that this is an exceptional case warranting an award of fees and costs.

**D.   Section 1927**

The Court also does not find that the evidence established that Ultratech's counsel acted recklessly or engaged in bad faith.

### CONCLUSION

The Court recognizes that although Tamarack won this litigation (up to this point, anyway), it may never recover from the harm it suffered as a result of being sued by a larger direct competitor. It had to pay $2 million dollars to defend itself and has had the cloud of an infringement suit hanging over its head for two years. Nonetheless, Congress has decided that the losing party in a patent infringement suit only has to pay the prevailing party's fees and costs in "exceptional" cases. As this is not an exceptional case within the meaning of 35 U.S.C. section 285, Tamarack's motion for attorneys' fees and costs is DENIED.

**IT IS SO ORDERED.**

Dated: October 11, 2005

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE